(No. 23800.—)
THE MACANDREWS & FORBES COMPANY, Appellee, *vs.* THE MECHANICAL MANUFACTURING COMPANY, Appellant.

*Opinion filed October 15, 1937—Rehearing denied Dec. 8, 1937.*

SAMUEL A. & LEONARD B. ETTELSON, (SAMUEL A. ETTELSON, CARL J. APPELL, and ERWIN M. TREUSCH, of counsel,) for appellant.

GANN, SECORD, STEAD & McINTOSH, (GUY VAN SCHAICK, and LOY N. McINTOSH, of counsel,) for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff, the MacAndrews & Forbes Company, (appellee,) filed an action in assumpsit against defendant, the Mechanical Manufacturing Company, of Chicago, (appellant,) alleging breach of warranties made in connection with a sale to the plaintiff of a certain machine for extracting moisture from licorice solution. The declaration, as amended, consists of four counts and is based on the claim that the defendant contracted to manufacture for the plaintiff a machine for spray-drying licorice. The declaration charges that the defendant warranted the machine for continuous operation; that there were both express and implied warranties that the machine would be fit for the purpose for which it was intended, and that this machine, known in this record as the Stutzke Patent Spray Dryer, failed to do the work for which it was intended. The declaration alleges the payment of fully three-fourths of the contract price, which was to be the sum of $18,750. Plaintiff's declaration charges that it expended large sums of money in the preparation of its building and in building a foundation for the installation of the machine, which, as shown by the record, is of about the height of a four-story building.

The defendant filed pleas of the general issue, the Statute of Limitations and certain special pleas alleging that the

dryer was a trade-name, patented article and sold as such; that no warranties, either express or implied, were made, and that the machine did the work for which it was built. It is conceded by the plaintiff that the machine will dry licorice and it is likewise conceded by the defendant that it will not do so continuously, but, after a few hours operation, must be shut down and cleaned out.

The plaintiff is a corporation engaged in the manufacture of licorice paste, having its factory located at Camden, New Jersey, where it conducts a large plant having a capacity of 100,000 pounds of licorice paste per day, with twenty-four hours operation. This commodity is sold largely to tobacco manufacturers for the treatment of tobaccos. Licorice root is imported largely from Asia Minor. In the manufacture of licorice paste the root is shredded, steeped in water, and a light licorice solution is drawn from it which is later evaporated into a heavy licorice liquor and then further evaporated to the form of paste. This paste is packed in boxes. The packing of the boxes is a slow process as the paste, on final evaporation, must be run hot into the boxes in successive layers, with intervals of time in the process to allow the licorice to cool and harden. The evidence shows that it takes from 20 to 21 hours to produce licorice paste and 24 hours more for completing the packing. It also shows that the licorice solution, when first drawn off, will spoil if allowed to stand for two hours, that the heavy liquor will spoil within five hours and that the paste, if it is not packed immediately, while hot, will harden in the kettles, requiring it to be dug out and reprocessed. Licorice paste is a black solid containing from seventeen to twenty-five per cent water, according to the nature of the process. Licorice paste is valued by its consumers for the licorice content. The extra weight of moisture and packing cases, the delay in handling, and the cost of transportation, figure largely in the economy of the production of licorice. A process, therefore, which extracts

the moisture and reduces licorice to a powder, renders its manufacture much more economical and rapid and its use more convenient, since the licorice paste dissolves slowly while the powder dissolves rapidly.

The plaintiff manufactures licorice for the trade. The evidence shows that it is neither a builder nor a designer of processing machinery. Ronald M. Bickerstaff, Jr., plaintiff's assistant manager, testified, and his testimony appears not to have been contradicted, that though plaintiff had experimented with small spray-drying machines, with the view to purchasing such a machine, they had never attempted to manufacture one and had never purchased one prior to the transaction with the defendant, for the reason that the economies in its use, by reason of waste, were not such as to attract plaintiff to such purchase. It is apparent that the plaintiff was much interested in securing a machine that was successful as a dryer and, in view of the fact that the processing must be continuous, it is readily seen that such a machine, to be of service to the plaintiff in its business, must be one suited to continuous operation.

The record shows that one Richard W. Stutzke had been experimenting with the manufacture of spray-dryers for organic solutions of different natures, such as yeast, malt, starch, dextrin, blood and the like, and had taken out patents on the principles involved in his processes though each machine that had been constructed, as the record shows, was different, because of the difference in the commodity to be spray-dried.

The defendant is a large manufacturer of machinery of various kinds and, in 1923, took over from Stutzke the manufacture and sale of steam spray-dryers and employed him to take charge of the work. In 1924, following an earlier conversation between the engineer of the plaintiff and Stutzke, some correspondence was had between the plaintiff and the defendant pertaining to the building of a machine for the plaintiff sufficiently large to meet its needs.

At that time Stutzke had installed in defendant's plant a small dryer which would evaporate about 15 gallons of solution per hour. Certain test runs were made by the defendant during the year 1924 on licorice liquors furnished by the plaintiff, and a good deal of discussion concerning the advantages of defendant's machine was had.

It appears from the record that licorice powder, to be acceptable to the tobacco trade, must be free from a burnt or flat taste. Some of the tests that were made on the defendant's machine resulted in such a taste in the licorice and in some it was free from it. A reading of the correspondence that passed between the parties discloses that it was definitely understood between these parties that plaintiff required a machine that would operate economically and continuously. In fact, throughout this record there is no intimation that the defendant considered that it was to furnish any machine other than one suited for continuous operation. As a result of this correspondence, and the experiments conducted by the defendant in its plant with licorice furnished by the plaintiff, as to which tests much inquiry had been made by the plaintiff concerning defendant's ability to get a successful machine which would process at least 100 gallons of licorice liquor per hour, and of a quality which it could use for its trade, and assurances on the part of the defendant that it had, as a result of such experiments, produced a machine which would meet plaintiff's need, plaintiff, on September 8, wrote the following letter to the defendant:

"Will you please have made up and mailed to us, three copies of formal contract, one of which is to be returned to you with our signature when accepted, for one Stutzke Spray Dryer for use with licorice extract, capacity of 100 gallons per hour evaporation, using steam at 150 lbs. per square inch pressure, and electricity three phase, 60 cycle, 440 volts.

"Please state or include—

"(1) Price, terms and delivery.

"(2) Guaranteed steam consumption in lbs. per lb. of evaporation.

"(3) Guaranteed electric consumption in k.w. hours per lb. of evaporation.

"(4) Provision or certificate from Hartford Steam Boiler Inspection and Insurance Co., approving all parts under boiler steam pressure to 200 lbs. per square inch.

"(5) Guarantee of overall yield or per cent of weight of dry solids delivered from machine to the weight furnished it.

"(6) Guaranteed evaporation in lbs. water per hour over 24-hr. period.

"(7) Statement of maximum density licorice solution that can be dried with your outfit.

"We will want to inspect your installation in operation that is in our vicinity if it is possible to do so, and we would like to have your contracts at hand by that time.

"As we have explained to your Mr. Hubbard, the cost of evaporation with your dryer is high, but there are certain factors that may induce us to go ahead with our installation. An inspection of one of your plants in commercial operation will be of great assistance to our executives in making their decision."

To this letter the defendant, on September 19, replied. Its letter, in so far as is material to the inquiry here, is as follows:

"Replying further to your letter of the 8th, and following up ours of the 11th, our Engineering Department has now gone over the details of the 100-gallon Stutzke Dryer to operate under 150 pounds steam pressure, to pass Hartford Steam Boiler Inspection and Insurance Company's inspection for 200 lbs. pressure per square inch. We quote you as follows:

"We propose to furnish one 100 gallons capacity Stutzke Patent Spray Dryer complete with fittings for operating consisting of the following items as shown on Drawing QD 530: * * * Taking up now the seven points outlined in your letter; the above will serve as a reply to No. 1. On the balance, we furnish you the following information:

"No. 2. The steam consumption of this machine will be 1⅓ lbs. per pound of liquid sprayed.

"No. 3. The electrical consumption will be .015 k.w. per pound of liquid sprayed, based on liquid weighing 9½ lbs. per gallon. This covers all motors on the machine proper, but does not include motor for the liquid feed pump.

"No. 4. We will furnish certificate of inspection for 200 pounds pressure per square inch, from the Hartford Steam Boiler Inspection and Insurance Company.

"No. 5. We guarantee the losses will not exceed three per cent (3%) of the total yield when machine is handled according to our

instructions. This may be slightly higher at the time of starting up, but only until the interior surface is covered with the powder that will naturally accumulate on any surface.

"No. 6. This machine is designed for the evaporation of 100 gallons of liquid per hour irrespective of the amount of solids contained therein, and we will guarantee 100 gallons of water evaporation per hour if no solids are present, and 100 gallons of liquid evaporation containing solids from 0 to 40%.

"No. 7. We have found from various tests that a density of 18° Baume works best in our atomizer. * * * The Mechanical Manufacturing Company grants to MacAndrews and Forbes Company exclusive right to the use of the Stutzke Dryer for drying licorice for tobacco products."

On November 5, following, the formal acceptance of the plaintiff was sent to the defendant. In the month of December, following, the terms of payment were agreed upon, whereupon the plaintiff altered its building and added new foundations to accommodate the machine which was later installed. On June 6, 1926, plaintiff paid defendant the sum of $8300 and on August 11, 1926, paid an additional sum of $4150. After experimenting with the machine until April 17, 1929, during which time defendant made certain changes, only to find that when the machine operated more than a few hours at a time the licorice powder would stick to the sides of the main drum, become heated, and when exposed to air would scorch or burn, ruining it as a commercial commodity, plaintiff, on that date, served notice on defendant that June 1, following, would be the limit of time given the defendant to complete the machine so that it would operate successfully, whereupon the defendant asked for a month's extension of that time, stating that certain changes which it had in mind would cause the machine to work properly. This extension was granted to July 1, but it appears from the correspondence later in July that the defendant did not succeed in making the machine operate, and on July 10, 1929, the plaintiff wrote the defendant saying that they were unable to agree to further experimenting on the machine and must

repeat their demand made on April 17, that the dryer be removed and the money paid be refunded. Defendant, however, asked for further time and submitted a proposal to the plaintiff which was, on December 19, 1929, reduced to a supplemental contract, reciting the execution of the previous contract for a machine for drying licorice, pointing out the dispute arising as to their rights, and reciting that the defendant, therein called the first party, was willing to make certain changes in construction subject to the terms and conditions of the supplemental contract. It is not argued that this supplemental contract varies the terms of the original contract and it specifically recites that it is made without prejudice to the rights of either party under the original contract. On May 28, 1931, a final demand was made upon the defendant to take the machine and pay plaintiff the sum of $43,000, in full of the amount of money paid defendant by the plaintiff and expended by plaintiff in the matter. Plaintiff brought this suit on August 13, 1932, and recovered judgment in the sum of $37,426.10, which was affirmed by the Appellate Court. The cause is here on leave to appeal.

The principal issue which is involved in the case is whether there was an express or an implied warranty that the machine would process 100 gallons of licorice liquor per hour over a 24-hour period. It is conceded that the machine was of no value to the plaintiff if it would not do this, since the successful use of it required continuous performance. The defendant says that there was no warranty, either express or implied, concerning continuous operation; that it endeavored, at the request of the plaintiff, to make the machine so work, but that it did not warrant that it would. Plaintiff, on the other hand, argues that, aside from the previous correspondence and experimentation conducted by the defendant to produce a machine which would operate continuously, the two letters,—plain-

tiff's of September 8, 1925, and defendant's, of September 19, 1925,—show an express warranty that this machine would operate economically and successfully on 100 gallons of liquor per hour over a 24-hour period. To this the defendant replies that evidence other than its letter of September 19, and the acceptance thereof, is not competent because the defendant's letter of September 19 did not expressly warrant operation of the machine for 24-hour periods and contained no language that can be construed as such a warranty. Plaintiff's counsel further say that even if this were true, which it denies, the fact that the plaintiff was not a builder of these machines and relied on the skill and promises of the defendant to produce a machine which met its needs, created, under the first clause of section 15 of the Uniform Sales act, an implied warranty that the machine would so operate. This the defendant denies, and thus is the issue made up.

First, was there an express warranty? An express warranty is one imposed by the parties to the contract. An implied warranty is one imposed by law. Plaintiff claims there was an express warranty arising out of language of plaintiff's letter of September 8, where it requires a guarantee, "(6) Guaranteed evaporation in lbs. water per hour over 24-hr. period," and the defendant's reply thereto: "Taking up now the seven points outlined in your letter; the above will serve as a reply to No. 1. On the balance, we furnish you the following information: * * * No. 6. This machine is designed for the evaporation of 100 gallons of liquid per hour irrespective of the amount of solids contained therein, and we guarantee 100 gallons of water evaporation per hour if no solids are present, and 100 gallons of liquid evaporation containing solids from 0 to 40%." On the other hand, defendant says that, by its letter of September 8, the plaintiff demanded such a guarantee of 24-hour operation but that it did not get it for the reason that defendant's reply of September 19 did not go that far. So,

whether there is here an express warranty furnishes the first inquiry in the case.

No particular words or forms of expression are necessary to create an express warranty. A positive assertion of a matter of fact made by the seller at the time of a sale, for the purpose of assuring the buyer of the fact and inducing him to make the purchase, which assertion is relied on by the purchaser, constitutes a warranty. (*VanHorn* v. *Stautz*, 297 Ill. 530; *Robinson* v. *Harvey*, 82 id. 58; *Thorne* v. *McVeagh*, 75 id. 81; *Wheeler* v. *Reed*, 36 id. 81.) Whether there was an express warranty is to be determined from the intent of the parties as shown by expressions or words used in the contract and the meaning to be given to them. If the intent was to create a definite contract of warranty as to a certain quality of the article sold, such is an express warranty though the contract may not have used the words "express warranty" or either of them. The intention of the parties is to be determined from the language employed, when read in the light of the context of the instrument and such surrounding circumstances as will aid the court in arriving at the true meaning of the parties. (*Geithman* v. *Eichler*, 265 Ill. 579; *Goodwillie Co.* v. *Commonwealth Electric Co.* 241 id. 42; *Drueckcr* v. *McLaughlin*, 235 id. 367.) In case of ambiguity we may look to the interpretation which the parties themselves have placed upon the agreement for assistance in determining its true meaning. (*Storey* v. *Storey*, 125 Ill. 608; *Vermont Street M. E. Church* v. *Brose*, 104 id. 206.) It is also the rule that, where a contract refers to another instrument or to a certain part thereof by specific designation, it is proper that the court know what such provision of the other instrument is. Defendant's letter of September 19 refers directly, and purports to be an answer to, a numbered item in the plaintiff's letter of September 8. Whether it was intended by the defendant that such answer should be construed as a warranty of 24-hour performance by this ma-

chine, is to be determined by a construction of these instruments and the conduct of the parties.

Defendant's reference to item 6 of plaintiff's letter was in ·direct response to the latter's request for a machine to spray-dry licorice, with ·defendant's guarantee as to evaporation over a 24-hour period. There is much evidence in the record that both parties understood and intended that defendant was to furnish a machine that would evaporate 100 gallons per hour for a 24-hour period. (1) It was the understanding ·between the parties, as shown by the record, for a number of months before this contract was entered into, that what plaintiff had to have was a drying machine that would operate on a commercial scale; (2) the experiments conducted by the defendant and its agent, Stutzke, were for the purpose, as shown by their correspondence, of producing a machine which would operate continuously. Their efforts were expended toward the completion of a machine that need not be shut down after a few hours operation; (3) the record is replete with evidence of their attempts to perfect a dryer that would operate continuously without burning. It is also in evidence that, prior to making the contract, defendant informed plaintiff that it had succeeded in that regard. In fact there is, in the record, nothing to indicate that the machine did not, during the tests made by defendant, operate properly for a short time, for at no time does it appear that there was any difficulty in making it operate for a few hours; but the difficulty lay in the fact that, when operated continuously, it was found that the product was scorched. The longest period of operation without burning was 14 hours; generally it was from 6 to 7 hours.

Counsel for defendant argue that this is because of the inherent nature of licorice and one which no one could control. Such is not, however, sustained by the record as to the nature of licorice. An examination of the evidence shows that in no other instances, by other methods

of drying, was combustion or scorching found present. The evidence is that, when heated to a temperature of 275° Fahrenheit, or more, powdered licorice will show signs of carmelization or scorching if allowed to come immediately into contact with air. The witness Stutzke, agent of the defendant, was of the opinion that high temperature and access to air were necessary to cause licorice powder to scorch. These facts were known to the defendant before it contracted to furnish a machine that would operate continuously and at the same time produce a merchantable product. It was the opinion of witnesses, who were agents and engineers of the defendant, that a machine which would properly discharge licorice from the dryer and avoid its exposure to high temperatures and air, could be successfully operated continuously. Correspondence of the parties shows that such was the machine which the defendant attempted to perfect. When this machine was installed and failed to so operate, the defendant, through some years thereafter, attempted to perfect it in that particular, and the record is barren of any evidence that, at any time during that period following the execution of the contract and the installation of the machine, defendant suggested that it had not warranted the machine to operate continuously or that the machine constructed was all it had guaranteed. Correspondence shows that during the latter months of the period between the time of installation and bringing this suit in this case, it was suggested by defendant that it had now brought the machine into successful operation and thought it should be accepted and the balance paid.

These facts are all evidence competent to be considered as bearing on the question whether, by the letter of defendant of September 19, 1925, it was intended to warrant, under item 6 of plaintiff's letter of September 8, the evaporation of 100 gallons per hour of liquid containing not more than forty per cent solution for a period of 24 hours. Defendant argues that since the words "liquor" or "con-

tinuous operation" do not appear in the contract, there is no possibility of any express warranty that the machine would operate continuously on licorice. It is not denied, however, that it was understood by both parties that a machine should be constructed by the defendant which would operate on licorice on a scale required by plaintiff's trade.

It is also argued that the contract included the language, "All agreements are contingent upon causes beyond our control." These words were printed on the bottom margin of defendant's regular letterhead and so appear at the bottom of the first page of the contract. Such expressions usually refer to strikes, shipping conditions, acts of God, and the public enemy, and cannot be said to override a warranty that a machine furnished will render a certain required service. Here, notwithstanding that language, defendant, after experimenting, assured the plaintiff that it had produced a machine which would meet plaintiff's requirements.

It is a general rule, in the construction of contracts, that the writing is to be interpreted as a whole, and all writings forming a part of the same transaction are interpreted together. Whether an express warranty in fact exists, is to be determined by the language used and the surrounding circumstances of the parties. (*Chicago Auditorium Ass'n* v. *Fine Arts Building,* 244 Ill. 532; *Geithman* v. *Eichler, supra;* Restatement Law of Contracts, secs. 230-235.) We are convinced that the record in this case shows an express warranty for 24-hour operation of this machine. That the machine failed to so operate is conceded.

Counsel urge that the Statute of Limitations is a bar to the action on this contract. It is clear, however, that there was not to be an acceptance and final payment therefor until the conditions of the contract had been met. The suit was brought within the statutory period after the rights

of the parties had become fixed, and this contention cannot be sustained.

Under the views hereinabove expressed it becomes unnecessary to consider other questions raised in the case.

The judgment of the Appellate Court, affirming that of the trial court, is right, and will be affirmed.

*Judgment affirmed.*