Almar Forming Machine Company, Appellee, v. F. and W. Metal Forming Machinery Company et al., Appellants.

Gen. No. 41,229.

Opinion filed January 22, 1941.
Rehearing denied February 5, 1941.

CAMPBELL, CLITHERO & FISCHER, of Chicago, for appellants; DELBERT A. CLITHERO and RAYMOND P. FISCHER, of counsel.

LOUIS S. COHN, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

On May 12, 1937, the Almar Forming Machine Company, a corporation (hereinafter referred to as "Almar" or "plaintiff"), and F. & W. Metal Forming Machinery Company, a corporation (hereinafter referred to as "F. & W."), signed, sealed and delivered a written contract, the preamble of which recited that F. & W. was the sole licensee under two applications

for letters patent, filed by Harold Flagler, serial No. 122,892 filed January 29, 1937, entitled, "Method of and machine for bending sheet metal," and serial No. 136,984 filed April 15, 1937, entitled, "Edge Bending Machine," and that Almar desired to obtain the sole and exclusive right from F. & W. for a certain period to sell machines embodying either or both of the inventions. The agreement further provided that:

"Almar shall have the sole and exclusive right of sale and distribution (except as hereinafter provided) of machines as described in the specifications of the above identified applications for Letters Patent for three years from the date hereof, with the right to extend this agreement from year to year thereafter; but F. & W. shall have the right to amend clause III and clause VI.

"II. Almar will pay to F. & W. for each of the machines, as hereinafter described which it shall sell, as follows: (a) for each machine as described in the specification of application Serial No. 122,892,—irrespective of what claims are now included in said application or which may hereafter be included in a patent which may be issued on said application,—the sum of Two Hundred Dollars ($200.00) plus the actual and legitimate costs of producing said machine inclusive of all overhead properly allocatable to the manufacturer thereof, it being agreed that such production cost of each machine is at the date of this agreement Two Hundred Fifty Dollars ($250.00); provided, however, that for each ten per cent (10%) increase in such legitimate and actual cost of manufacture, the amount to be paid shall result in an increase of Twenty Dollars ($20.00) in the first figure herein recited, it being the intent of this provision that as the cost of manufacture increases by steps of ten per cent (10%), the named figure of Two Hundred Dollars ($200.00) shall be similarly increased a like percentage, it being understood, however, that this latter provision does not

modify the agreement that any increase in the cost of manufacture,—whether amounting to ten per cent (10%) or not,—shall be paid by Almar. (b) For each machine as described in the specification of application Serial No. 136,984,—irrespective of what claims are now included in said application or which may hereafter be included in a patent which may be issued on said application,—the sum of Five Dollars ($5.00) plus the actual and legitimate costs of producing said machine inclusive of all overhead properly allocatable to the manufacture thereof, it being agreed that such production cost of each machine is at the date of this agreement Twelve Dollars ($12.00) ; . . . (c) Whenever F. & W. shall report to Almar that the cost of producing either or both of the above machines has increased above the figures named in (a) and (b), i.e., Two Hundred Fifty Dollars ($250.00) and Twelve Dollars ($12.00) respectively, Almar shall have the right to call upon F. & W. to exhibit the invoices indicating the reasons for such asserted increase. . . .

"III. It is of the essence of this contract that the minimum number of machines to be sold by Almar per year shall be twenty-five (25) of those embodying the structure described in the specification of application Serial No. 122,892, and Three Hundred (300) of the machines described in the specification of Serial No. 136,984; it being understood, however, that in determining these figures for the first year of the life of this contract, Almar shall be given credit for those machines which may already have been sold by it at the date of the execution of this contract. . . .

"V. The exclusive right to sell as hereinbefore granted by F. & W. to Almar shall be extended to include the right to Almar to grant sub-licenses to other persons, real or corporate, to promote the sale and distribution of the above mentioned machines, it being understood, however, that in all cases Almar shall be responsible for the acts of its thus-appointed agents in

all respects relating to this agreement, and that in all cases the responsibility for paying for the machines thus sold in accordance with paragraphs (a) and (b) of Section II shall rest upon Almar in all respects as if Almar were making the sale itself.

"VI. F. & W. will manufacture and furnish the aforesaid machines in reasonable quantities required by Almar, but does not obligate itself to furnish more than eight of the big machines and fifty of the little machines in any thirty day period; . . . "

On June 15, 1939, plaintiff filed a complaint in equity in the circuit court of Cook county for specific performance of the contract to manufacture and sell the machines, for an injunction forbidding the defendants from violating the contract and for damages and loss of profits resulting from the alleged breach of contract. Defendants filed an answer, to which plaintiff filed a replication. Shortly after the filing of the complaint, plaintiff appeared before the chancellor, and without having served a notice on the opposing parties, obtained an order granting a temporary injunction for specific performance of the contract for the manufacture and delivery of the machines. The order was reversed in an opinion reported as *Almar Forming Machine Co. v. F. & W. Metal Forming Machine Co.,* 301 Ill. App. 591, where, at page 596, this court said that "such multitudinous and detailed activities of individuals are not supervised and directed by a court of equity and the order directing that this be done should not have been entered." The cause was referred to a master in chancery, who reported in favor of the plaintiffs. Objections filed to the master's report were allowed to stand as exceptions. These exceptions were overruled and a decree was entered substantially in accordance with the recommendations of the master. The decree directed that the defendants and each of them be enjoined until May 12, 1940, "from in any way or manner violating the terms, conditions

and provisions of the contract dated May 12, 1937, between Almar Forming Machine Company and F. & W. Metal Forming Machinery Company," and from in any manner accepting any order, selling or offering for sale or distributing to any person, firms or corporation, except plaintiff and its sublicensees, any and all of the metal-forming machines referred to in the contract, likewise from in any manner advertising, exhibiting or displaying any and all of the metal-forming machines designated in the contract, and the decree also required defendants to account to the plaintiff "for its loss of profits, damage and costs, together with other damages and costs sustained in or to be sustained up to and including May 12, 1940," by plaintiff as a result of having sold the above-described machines to persons, firms or corporations other than plaintiff. The decree then again referred the case to a master in chancery for the purpose of stating the account as to the sum or sums of money due and owing to the plaintiff "for its loss of profits, damages and costs from the defendants." The decree further entered a judgment in favor of F. & W. and against plaintiff in the sum of $878.67, which sum was awarded to F. & W. "as its damages, costs and attorneys' fees for the erroneous issuance of the temporary injunction." The decree directed that this judgment for $878.67 be set off against any sum or sums of money found to be due and owing to plaintiff from defendants. This appeal is prosecuted by the defendants for the purpose of reversing the decree except that part awarding to the defendant F. & W. a judgment in the sum of $878.67.

The first point advanced by the defendants is that the master's findings of fact and the undisputed evidence in the record established that under the rules of pleading and the principles of law applicable to instruments under seal, the contract of May 12, 1937, has been abrogated. Plaintiff responds by saying that

the court correctly found that the contract is in full force and effect and that the written contract was not abandoned. Plaintiff maintains that if F. & W. did not insist on compliance with a certain provision of the contract which was inserted therein for its benefit, such conduct does not affect the terms or enforcement of the contract. As announced in *MacAndrews & Forbes Co. v. Mechanical Mfg. Co.*, 367 Ill. 288, the contract must be construed in the light of the circumstances surrounding its execution, including the patent application to which it refers. The parties are in substantial agreement that a sealed instrument cannot be modified or changed by parol. Plaintiff cites *Fuchs v. Peterson*, 315 Ill. 370, as authority for the proposition that while a sealed executory contract cannot be modified or changed by parol so as to authorize either party to sue upon it, it is equally well settled that a party to a written contract may by parol waive performance of a condition which was inserted in the contract for his benefit. It becomes necessary, therefore, to discuss the facts. Prior to January, 1937, Harold G. Flagler designed two machines for bending sheet metal. One was a small hand machine, known as "Easy Edger," which made an ordinary flange or right angle bend. The other machine was a power-driven machine, which the plaintiff named the "Standard." The latter machine formed a seam or double fold in sheet metal. The particular shape of the fold thus formed was commonly known to the trade as a Pittsburgh lock. On January 29, 1937, Flagler applied for a patent on the power lock-forming machine and on the method of bending sheet metal which it embodied. He also applied for a patent on the "Easy Edger" machine. Thereafter, F. & W. became the sole licensee and began to manufacture and sell the "Easy Edger" and the power machine called "Standard" to the Ward Machinery Company, of which William M. Ward was president. The plaintiff corporation, Almar Forming

Machine Company, was then organized by Ward, and on May 12, 1937, Almar and F. & W. entered into the written contract heretofore set out. The contract recited that the machines to be manufactured and sold were those described in the specifications "irrespective of what claims are now included in said application or which may hereafter be included in a patent which may be issued on said application." The contract also referred to the sales already made and stated that for the purpose of satisfying the requirements of the contract as to the minimum number of machines to be sold each year, machines already sold at the time of the execution of the contract were to be included in the first year's sales. The annual contract minimum is 25 of the "Standard" machines described in patent application No. 122,892, and 300 of the edgers described in patent application No. 136,984. The patent application covering the "Standard" machine referred to in the contract included detailed drawings showing its motor, shafts, gears and rollers and described each part in its relation to the other parts in minute detail. The machines were further identified by the contract as those that had been sold prior to the execution thereof. After the execution of the contract the parties proceeded to perform according to its terms, and the defendants, F. & W., sold plaintiff "Easy Edgers" for $17 each and "Standard" machines for $450 each, the prices fixed by the contract. There was nothing unique about a power-driven machine to form Pittsburgh locks. Other machines were on the market and the specifications of the patent recited that the invention relates to the sequence of steps in the bending, and that the metal-forming machine "is definitely less expensive than those which are now used for similar purposes." During the year 1937 other manufacturers began to produce cheaper machines. William M. Ward, plaintiff's treasurer, testified that his salesmen said "that it was necessary

to get a machine at a cheaper price to meet the competition that they had.'' There is conflicting testimony as to whether Ward or Flagler first suggested that new machines be developed, but all the witnesses agree that the change in the course of dealings with the parties was initiated at a meeting in the Ward offices of salesmen employed by the plaintiff and the Ward Machinery Company, held on December 27, 1937. Plaintiff's witnesses all testified that at this meeting the salesmen present agreed that they needed a lighter, cheaper machine and also a heavier machine to meet competition. Ward testified that at this salesmen's meeting he turned to Flagler, president of F. & W., ''and asked if he could make a machine that sold for $450.'' Flagler said that he would try. As a result of this meeting F. & W. proceeded to design another machine. This machine was called the ''Junior.'' It had a 3/4 horsepower motor instead of the 1 horsepower motor which was always used on the ''Standard'' machine; the design of the cabinet of the machine was altogether different, the machine was of a much cheaper construction and its appearance was altogether different from the appearance of the ''Standard'' machine which had been delivered under the written contract and was shown in the original patent application. After the new machine had been designed, a partially completed or ''dummy'' model was set up in defendant's plant, and Ward, plaintiff's representative, was called to examine it. The testimony as to what was said on this occasion is conflicting. Flagler testified that he told Ward $300 was the best price F. & W. could make on the ''Junior'' machine, and that in view of the lower price a new contract was necessary. Ward denied that he said a new contract was necessary. After these negotiations F. & W. proceeded to manufacture ''Junior'' machines as well as the ''Standard'' machines. The first ''Junior'' machines were sold to the plaintiff on January 14, 1938. The ''Junior'' ma-

chines were sold at a price of $300 instead of the price of $450 each, which the written contract contemplated for a motor-driven lock-forming machine. In accordance with the opinion of the salesmen that a heavier machine should be designed, F. & W. proceeded to design and construct a machine known as the "Heavy Duty." The first "Heavy Duty" machine was sold to plaintiff on February 17, 1938. On February 15, 1938, Ward and Flagler had a conversation and Ward wrote to Flagler under date of February 15, 1938, that "As per our conversation today, it will be understood that the Heavy Duty Machine will be invoiced at $775.00." The "Heavy Duty" machine is about three times the size of the "Standard" machine, and weighs three times as much as the "Standard" machine. It has a three horsepower motor instead of a one horsepower motor and has different starting equipment. It is adjustable for different gauges of metal. It has 24 forming rolls in 8 sets, instead of 14 forming rolls in 5 sets on the "Standard" machine, which are shown and described in the patent application and it forms a Pittsburgh lock by 8 steps instead of 5. In April, 1938, about a year after the execution of the contract, Almar ceased to order machines, and thereafter all orders were placed by the Ward Machinery Company. The machines were invoiced and delivered to the Ward Machinery Company, and the Ward Machinery Company sold them to the public through its own organization. Thereafter, Almar employed no salesmen, paid no salaries, paid no rent, purchased nothing, and aside from expenditures like franchise taxes necessary to keep the corporation in legal existence, Almar expended no money after April, 1938. During the spring of 1938, a competitor developed a dual purpose machine, which not only formed the Pittsburgh locks, which were the only locks which the "Standard," "Junior" and "Heavy Duty" machines were capable

of forming, but also formed other types of bends or locks. To meet this competition F. & W. developed the "Universal" machine which, in addition to Pittsburgh locks, formed locks known as drive cleat rolls, standing seam rolls, double seam rolls and right angle flange rolls. As a result of conversations between Flagler and Ward, F. & W. spent more than $2,000 designing and developing the "Universal" machine and sold the first six to the Ward Machinery Company at a price of $500 each. F. & W.'s actual costs, without any profit, ran from $450 to $475, leaving a profit of from $25 to $50 a machine instead of the minimum profit of $200 provided by the written contract. During the period from August, 1938, to May 12, 1939, the Ward Machinery Company purchased 11 of these "Universal" machines ranging from $452 to $725 each. After the "Universal" machine had been brought out, Ward had further conversations with Flagler about the desirability of designing the "Master" machine, which was a machine similar to the "Standard" machine, combined with equipment to perform operations other than making Pittsburgh locks, including double seam rolls and drive cleat rolls. The machine was developed and the Ward Machinery Company purchased the "Master" machines, the first purchase being on October 6, 1938. During the period from October 6, 1938 to May 12, 1939, the Ward Machinery Company purchased 27 "Master" machines at prices ranging from $325 to $441 each. Flagler told Ward he could not make much money on the machines selling at that price, but that he would try it. This price did not cover the cost of manufacturing plus $200, as provided by the contract. In November, 1938, F. & W. sent the Ward Machinery Company a new price list with a letter stating that it superseded "all previously quoted prices, either verbal or written, and will remain in effect until further notice." This letter made no reference to the original written contract. Defendant

did not sell any of the machines to any one other than the plaintiff prior to April, 1938, or to any one other than the Ward Machinery Company after that date until May, 1939, the end of the second year of the contract. Ward testified that Flagler told him in May, 1939, that he "intended to sell 'Easy Edgers' to dealers other than ourselves," and that his attorneys advised him that the contract was of no value. Flagler testified that he told Ward that the agreement had not been in effect for so long that he was going to sell the "Easy Edger" machine to other dealers, and that Ward said he (Ward) thought that he ought to have an exclusive on that one machine, and that Flagler replied that the contract had been void a year previously. Thereupon the Lock Former Corporation, of which Flagler is president, which had been organized early in 1939, began to sell the "Easy Edgers" to persons other than the plaintiff, Almar, or the Ward Machinery Company. In addition to the "Easy Edger," the Lock Former Corporation sells another newly developed machine entirely different from any of the machines in question. All of the machines made under patent application No. 136,984, and subsequently known as "Easy Edger," were all made under and pursuant to the terms of the written contract of May 12, 1937. The principal dispute in this case pertains to machines embodying patent application serial No. 122,892, which are identified as metal-forming machines. From a computation of their relations under the contract, it appears that plaintiff enjoyed a gross profit of $30,750 on the sale of the machines manufactured by F. & W. The Lock Former Corporation was organized by Flagler and occupied the same premises as the Flagler Engineering Company and F. & W. Metal Forming Machinery Company. Plaintiff contends that the language "irrespective of what claims are now included in said application or which may hereafter be included in a patent which may be

issued on said application'' constitutes the inclusion
in the contract of any modification, change or addition
to the original patent application, and was not a limi-
tation. Defendants contend that the evidence clearly
establishes that there was a voluntary abandonment
of the written contract. On the other hand, plaintiff
contends that notwithstanding the difference in the
design, weight, power and price of the machines, they
were delivered under the original written contract.
Defendants state that the new machines were delivered
pursuant to verbal agreements. The court found that
all of the metal-forming machines embodied patent
application No. 122,892, and were made pursuant to
the contract of May 12, 1937. We find that the contract
of May 12, 1937, is a contract for the sale of two types
of machines. Such machines had already been manu-
factured and sold to the Ward Machinery Company,
of which William M. Ward, plaintiff's treasurer, was
president during a period of two months prior to May
12, 1937. When the contract of May 12, 1937, was
signed, the parties knew that patent applications had
been filed. They also knew that patent application
serial No. 122,892, covering the motor-driven machine
about which the principal dispute in this case centers,
had been filed. Therefore, when they executed the
contract of May 12, 1937, they knew exactly what ma-
chines they were dealing with. We are of the opinion
that they intended to contract with respect to the two
existing machines. This view is strengthened by the
provision that the plaintiff ''shall be given credit for
those machines which may already have been sold,''
and the testimony of plaintiff's treasurer Ward that
this clause of the contract referred to the ''Standard''
machine and the ''Easy Edger.'' The patent specifi-
cations contained complete and detailed drawings of
the machine and of all its important shafts, rollers
and gears. The text of the specifications refers to
these drawings and describes the nature and operation

of each part. Plaintiff concedes that while an executory contract under seal cannot be altered by a parol agreement, nevertheless, the law is well settled that a party to such a contract may waive performance of a condition which has been inserted therein for his benefit, and that such waiver is not held to be a change in the terms of the original contract. Defendants do not challenge the correctness of this statement of the law. They do say, however, that they find it difficult to understand how F. & W. can be said to have "waived" the requirements of the contract that it manufacture and sell two specified types of machines and "waived" into existence an obligation to design and manufacture six types of machines. We agree with the view of the defendants that the conduct of the parties does not show a waiver, but does show a definite abandonment of the contract.

Defendants' second contention is that a court of equity will not enforce a contract at the instance of one who has not performed his own obligations thereunder; and defendants' third point is that a court of equity will not undertake to enforce a contract if the enforcement would require it to supervise a long series of manufacturing operations. In passing on the first point we decided that the parties abandoned the written contract. It follows that the plaintiff did not perform such contract. As we have seen the decree enjoins the defendants from in any manner violating the terms and provisions of the contract of May 12, 1937. This is in reality a decree of specific performance, though negative in form. This clause of the decree contains the same vice that was criticized by us in the appeal from the temporary injunction, wherein we said: "This amendatory [mandatory] provision, by its terms, puts the court in the position of determining how many machines should be furnished by defendants or at least to decide as to how many machines are sufficient to comply with the contract. . . . In

addition to this such multitudinous and detailed activities of individuals are not supervised and directed by a court of equity and the order directing that this be done should not have been entered." A court of equity will in a proper case, enforce a negative covenant. The clause that is being criticized, however, enjoins the defendants from violating the terms of the contract, which, in effect, is an effort to enforce specific performance of the contract.

The fourth point advanced by defendants is that plaintiff is not entitled to equitable relief because there is no showing of irreparable injury. The record clearly shows that the machines are not irreplaceable. Other machines are handled by competitors which do the same work. The patents covered the particular method of effecting the bends. We are of the opinion that even if the contract had not been abandoned, the plaintiff had an adequate remedy at law to recover damages for the alleged breach of the contract. In their fifth point defendants maintain that a court of equity will not enforce a contract unless all the terms and conditions are definite and certain. The decree finds that the contract "still is in full force and effect; that the changes made by Harold Flagler and F. & W. Metal Forming Machinery Company do not affect the validity and effectiveness of said contract dated May 12, 1937." Plaintiff ceased to pay contract prices for the machines. Four machines, in addition to the two machines specified in the contract, were designed and developed. It is obvious that a court of equity could not enforce the contract as changed, because of uncertainty. The sixth point urged by defendants is that a court of equity will not enforce a contract unless its obligations are mutual and equitable in the event of breach by the other. Defendants made a persuasive argument in support of this point. We are of the opinion, however, that the contract does contain mutual covenants and obligations. The seventh contention of

defendants is that a court of equity will not assume jurisdiction to award an accounting of damages for an alleged breach of contract and thereby deprive a litigant of his right to trial by jury. Plaintiff replies to this contention by stating that no citation of authority need be made for the fact that the jurisdiction of a court of equity always includes the right to take an account between the parties where the court has once assumed jurisdiction. Hence, the plaintiff concedes that he is not entitled to an accounting unless the court has jurisdiction to give relief because of some equitable right.

Finally, defendants assert that the entire testimony of any witness who wilfully testifies falsely on any material issue, or is guilty of an attempt to foist spurious fabricated documents on the court, must be disregarded except as corroborated by credible evidence. One of plaintiff's contentions is that it performed its obligations under the written contract through the Ward Machinery Company, which the plaintiff contended at the trial was the plaintiff's sublicensee. The alleged sublicense is in the form of a letter from Almar to the Ward Machinery Company, dated May 17, 1937. Defendants argue that any reasonable man reading the record would be morally certain that the alleged sublicense document was a fabrication concocted and sponsored by the plaintiff's witnesses, William M. Ward and Vivian Stetzer in an attempt to establish a right of action in the plaintiff. Defendants also call attention to the fact that during the trial Ward swore that he was the president of the plaintiff corporation. The master so found. After the hearings before the master were concluded, defendants discovered that Ward was not and had never been the president of plaintiff corporation. The trial judge then admitted exemplified copies of the two annual reports filed by plaintiff corporation, each of which was sworn to by defendant Ward, as treasurer, and stated under oath that Alice

M. Ward was president of the corporation. At an early stage of the hearings Ward testified that "Almar Forming Machine Company granted a written license to the Ward Machinery Company, which I am going to produce as a matter of record." At a subsequent hearing his secretary, Vivian Stetzer produced a letter which was received as plaintiff's exhibit 8, and testified that this was the sublicense. Ward brought to the hearing a stenographic notebook and produced it in an attempt to substantiate the document introduced as exhibit 8 as genuine. It is not claimed that any one connected with defendant was ever shown a copy of exhibit 8, or informed that any sublicense existed. Miss Stetzer testified that this letter which purports to be dated March 17, 1937, was transcribed from notes placed in her stenographer's notebook, which was offered in evidence as defendants' exhibit 8. The book was turned over to the master for safekeeping. It appears from the uncontroverted testimony of defendants' witness, Pearl Cleeton, a member of the faculty of a business college, that the stenographic notes from which the plaintiff claims this sublicense was transcribed, are inserted on a blank page of a stenographer's notebook in the middle of a sentence in another letter directed to the Campbell Heating Company. The notes of the Campbell Heating letter are written in Munson shorthand. Miss Stetzer uses Gregg. Stenographic notes corresponding to the alleged sublicense are dated "3/17," but the alleged sublicense is dated May 17, 1937. The witness, Stetzer, first testified that the letter was dated March 17, 1937, and then attempted to correct her testimony and say it was dated May 17, 1937. The alleged sublicense is directed to the Ward Machinery Company, but the stenographic notes are directed to the Almar Forming Machine Company. The alleged sublicense was inserted in the middle of a letter written on March 18, 1937. The last letter in the stenographer's notebook,

other than the notes from which it is alleged plaintiff's exhibit 8 were transcribed, was written on March 23, 1937, and the book was filled, except for one blank page, nearly two months before the date written on the disputed letter. The stationery on which plaintiff's exhibit 8 was written bore a printed letterhead. Plaintiff did not buy and pay for any printed letterheads until November, 1937, six months after this letter was alleged to have been written, at which time plaintiff purchased 1,000 letterheads and 1,000 envelopes from the Jacobus Printing Company. In an attempt to explain how this letter could have been written before the stationery was printed, plaintiff produced an invoice from the American Printing Service, which indicated that in April, 1937, it had printed 50 letterheads for the defendant free of charge. All other correspondence between the parties prior to November, 1937, was on paper on which the letterhead had been typed, or inserted with a rubber stamp. Miss Stetzer could not recall that she ever saw a letter of the Almar Forming Machinery Company dated prior to November, 1937, which was written on a printed letterhead other than plaintiff's exhibit 8. Miss Stetzer looked through the entire file of correspondence for the years 1937 and 1938, consisting of more than 50 letters, and could not find a single letter dated prior to March 16, 1939, which was written on a typewriter having the same shape of the letter ''t'' as that which appears on plaintiff's exhibit 8. She stated that new type had been put on one typewriter at the Ward plant, but could not remember when it was installed. We are satisfied that the letter received in evidence as plaintiff's exhibit 8 was a fabrication. The conduct of Ward and Vivian Stetzer is reprehensible. Their testimony should be entirely disregarded except where it is corroborated by other credible evidence or by facts and circumstances in evidence. This conduct impugns the good faith of the plaintiff in bringing this

action. In *People v. Spaulding*, 309 Ill. 292, at page 305, our Supreme Court said:

"From the days of Moses to the present time it has been the law that a person who fabricates, suppresses or destroys evidence must take the consequences of the honest indignation which his conduct naturally excites. Moses declared, 'Cursed be he that removeth his neighbor's landmark.' (Deut. 27, 17.) Modern decisions establish the rule that all efforts by either party to a suit, directly or indirectly, to destroy, fabricate or suppress evidence may be shown as a circumstance indicating that the party's cause is an unrighteous one."

After a reading of the record and a consideration of the points presented and the authorities cited, we are convinced that the decree should be reversed. Therefore, the decree of the circuit court of Cook county is reversed and the cause remanded with directions to the chancellor to dismiss the complaint for want of equity, and to enter judgment for defendant, F. & W. Metal Forming Machinery Company, and against the plaintiff in the sum of $878.67, the amount heretofore found to be due to such corporation under the suggestion of damages for wrongful issuance of the temporary injunction.

*Reversed and remanded with directions.*

HEBEL, P. J., and DENIS E. SULLIVAN, J., concur.