**Gene Blade and Robert Lee, Plaintiffs-Appellees, v. Warren Sloan, Defendant-Appellant.**

Gen. No. 68–56.

Third District.

April 28, 1969.

Kenneth E. Critser and John J. Kritzer, of Monmouth, for appellant.

Love, Beal & Pratt, of Monmouth, for appellees.

ALLOY, J.

Defendant Warren Sloan, who was a farmer, attended a farm sale on January 23, 1965, accompanied by his hired man, Dale Prater. The sale was conducted at a point approximately 50 miles from defendant's home. Defendant was not acquainted with anyone attending the sale with the exception of the auctioneers. Defendant planned to bid on a 1962 A–C self-propelled four-row combine. He arrived prior to the sale and had an opportunity to examine the combine, and the record indicates that he did in fact examine it. Just prior to the auction of the combine, the motor was started and was run for a few minutes. The motor on the combine was newly painted. Prior to the time the bidding on the combine began, one plaintiff, Mr. Blade, and the auctioneer, both made statements that the combine was in good repair and ready to go to the cornfield. Defendant testified that in making the bid on the combine, he relied on the statements made

by Blade and the auctioneer, as he could not see into the motor. Defendant was the successful bidder at the auction and the combine was struck off to him for $7,325.

As the auction moved to another article, a stranger approached defendant and said, "Do you know that the block is busted on that combine?" Defendant then checked the motor and found where there had been a three-inch crack in the block which had been welded and painted over, probably with several coats of paint. Defendant then tried to locate the owners of the combine and finally found Robert Lee, one of the two owners. Defendant stated he had just learned of the cracked block and the weld. Plaintiff Lee admitted that the motor had been broken and said that it was done about a year ago. Defendant stated that Lee said: "But you don't need to worry about that motor, because I'll guarantee that motor." Plaintiff Lee denied making such statement and that the statement he made to the defendant after the sale concerned only the weld and his statement was that he would guarantee the weld. He also indicated in his testimony that the weld was made about a year and a half prior to the time of the sale, in the fall of 1963, and that the machine had been used for a full season and part of another season and that the weld had held effectively. He stated that it was possible to tell from the outside of the motor if the weld leaked from the inside out, and, from the condition of the oil in the motor when it was changed, whether it leaked from the outside in. All indications were, he stated, that there was no leak or problem with the weld. The combine was used for custom work so that it had a great deal of use after the weld was made. Gene Blade, the other plaintiff, also testified as to the condition of the weld and stated that it had given no trouble since it was made in the fall of 1963. Following the conversation with plaintiff, Robert Lee, defendant paid for the combine with a check.

On the following Monday, the defendant returned to the farm to pick up the combine. Plaintiff Blade had put it in a shed to protect it and he drove it out for defendant. Defendant brought his hired man, Mr. Prater, with him to drive the combine back to defendant's home. Prater testified that Blade showed him how to start the combine and how to operate the pedals. Prater also testified that he had never driven a self-propelled combine before but that he had driven tractors. Neither defendant nor Prater inspected the combine or checked the oil before Prater drove it away. At a point 23 miles from where the combine was picked up, it stopped running on the highway. Prater testified, "It just quit—stopped dead." He did not then inspect the machine but got a ride to another town and found the defendant. Prater also testified that he did not check any of the gauges during the time he was driving the machine and did not know if the oil gauge was functioning. Defendant Sloan (with Prater) went back to the combine that afternoon and put flares around it but did not examine the combine in any way.

On the following morning, defendant Sloan called Blade and told him that the combine had stopped along the road and it had run out of oil. There was no evidence in the record that Sloan had ever checked the oil after the combine stopped, but apparently defendant Sloan had inferred from what Prater had told him that the machine was out of oil. Blade asked where the combine was located and said he would be over. After defendant Sloan had talked to Blade he went to town and stopped payment on the check he had given for the combine, and then went to the sheriff's office to get someone to help him with the traffic when they moved the combine. Sloan and Prater then went out to the combine with a supply of oil. They waited until Blade and Lee came before looking at the combine. As Blade, Lee and defendant Sloan examined the combine, Lee found a hole in the pan and observed that it would do no good to put oil in the motor.

There was a conflict as to the testimony regarding what was said at this time by Lee and by Sloan. Defendant Sloan testified that Lee stated that Sloan would not have to stand the expense of that condition. Lee testified that he made no statement as to who would stand the expense of the repair to the hole in the pan or any other repairs. The combine was then towed by a tractor into a neighboring farmyard and Sloan, Blade and Lee went to Monmouth to the implement store which originally sold the combine to Blade and Lee, and had serviced it just prior to the sale. At that store, all of the parties discussed what parts were needed to repair the combine. The repair order was written up in Sloan's name, although Sloan testified that he did not participate in the negotiations as to the repair. Others testified that all parties participated in such discussions. While the parties were at the implement store, defendant Sloan first told Blade and Lee that he had stopped payment on the check he had given for payment on the combine. The implement dealer had requested that the machine be brought in to see what parts were needed, and defendant Sloan asked to be called when the machine was torn down. He later returned in about a week and saw the combine torn down and observed the damaged parts. The damage to the motor of the combine was extensive.

In the action filed in the instant cause, plaintiffs Blade and Lee sued to recover the amount of the sale of the combine and alleged a claim in one count under a contract theory, and in the second count alleged an action to recover on the check together with interest. Alternative counts sought damages for injury to the combine caused by the negligence of defendant and his hired man.

The record discloses that the mechanics employed by the implement dealer testified that the combine had been in their shop for a checkup, and that any necessary repairs to put it in good operating condition were made a week prior to the sale. Such testimony indicated that the

work was done and that a crankshaft oil seal was replaced, the valves were ground, and the motor was tuned. The testimony indicated that when the work was completed, the combine was working properly and there were no apparent defects which would interfere with the operation of the combine. There was specific testimony that there was no problem with the weld and that any leakage problem from either outside or inside the block could have been detected from the condition of the oil when the oil in the motor was changed. Blade and Lee both testified that they knew of no defect in the combine when it was sold and that the weld had held for a year and a half and had given them no problem. There was testimony that the damage to the motor was in no way related to the weld in the block. The record indicated that the damage to the motor was caused when the governor on the motor burned out or malfunctioned which caused the motor to speed up and eventually, when not stopped, to fly apart. There was evidence that if this problem of a malfunctioning governor was not detected within two or three minutes after it began, serious damage of the type actually involved in the instant case could result to the motor. It was also disclosed that there was no means of determining when the governor would malfunction and that it could happen at any time or it might never happen.

Following such hearing by the trial judge without a jury, the court found for the plaintiffs for the recovery of $7,325 and for interest at the rate of 5% in accordance with the statute (1967 Ill Rev Stats, c 74, § 2). On appeal in this Court, defendant seeks to reverse the finding of the trial court as being against the manifest weight of the evidence. Defendant had also filed a counterclaim for time and expenses incurred. The questions before us reduce themselves, basically, to whether there was an express warranty; the extent of the express warranty; and whether the finding of the trial judge that there was no

breach of warranty was against the manifest weight of the evidence.

■ It is apparent that there was an express warranty at the time the combine was auctioned. From the record it is clear that the warranty which was made was that the machine was "in good repair and ready to go into the field" to combine corn. Both parties to this cause refer to the Illinois Commercial Code (1967 Ill Rev Stats, c 26, § 2–313), which provides as follows:

"(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis for the bargain creates an express warranty that the goods shall conform to the description."

The subsequent section of the act simply provides that it is not necessary that the seller use such words as "warrant" or "guarantee" to create an express warranty. The warranty in the cause before us was limited to the condition of the combine at the time of sale and there was no warranty that the combine would continue in that condition for any specific number of days, weeks or months. The machine was a used machine and the seller warranted as to its present condition, but it did not amount to a guarantee of the future operation of the machine. To the extent we have indicated, however, there was an express warranty (MacAndrews & Forbes Co. v. Mechanical Mfg. Co., 367 Ill 288, 297, 11 NE2d 382; Keller v. Flynn, 346 Ill App 499, 508, 105 NE2d 532).

In determining this cause, the trial judge specifically stated, "Defendant has not proved by the greater weight of the evidence that the damage to and condition of the motor later in the day on January 25, 1965, 23 miles from the place where, and several hours after, he took possession of the machine, was, or was the result of, a breach of warranty that the machine at the time of sale was 'in good repair and ready to go in to the field.'" It is apparent that such determination by the trial judge, on the basis of the record before us, was not against the manifest weight of the evidence. While defendant was not told of the crack in the block and the weld prior to the sale, the evidence in the record shows that the weld held perfectly and was not in any manner the cause of the damage to the combine motor. The combine was run for a season and a half after the welding, and it was continually checked for both internal and external leakage. No leakage was detected by the mechanics either in checking the weld just prior to the sale or after the combine broke down. It was thus indicated clearly that the weld held, and that the weld was in no manner responsible for the damage to the motor. Under this set of facts there was no breach of warranty by failure to notify defendant at the time of the sale that the block had been welded. There was no showing of any defective condition of the combine which the plaintiffs knew, or by reasonable inspection should have known, about the combine motor prior to the sale of which they failed to inform defendant. The evidence indicates that it was not customary to check the governor when checking up and tuning the motor. Plaintiffs also testified that they never had any problems with the motor of the combine prior to the sale, and that the combine never vibrated or surged or made any unusual noises. There was direct evidence that the machine ran smoothly when it was driven back to the farm from the implement dealer just two days before the sale.

404

■ In the light of all such evidence it is apparent that the trial court was correct in determining that defendant had not proven a breach of warranty. The only evidence as to the cause of the damage to the motor, a distance of 23 miles from plaintiff's farm, was shown to be related to a malfunction of the governor. It was not shown that plaintiffs had any knowledge of any defect in the governor or had any trouble with the governor. On the basis of the record, there was no implication that the plaintiffs were at fault in any way in failing to check the governor prior to the time of the auction. The testimony indicated that the governor could malfunction when a pin breaks due to normal wear, and that if it is discovered in time and the motor is stopped, further damage could be averted.

A further question arises as to whether any statement was made by Robert Lee to defendant Sloan after the sale of the combine or by Blade or Lee to defendant Sloan at the time they were all inspecting the combine alongside the road after it had stopped. The conversation between Lee and Sloan after the time of the auction dealt only with the question of the weld. While the evidence was in conflict on this subject, the determination of the trial judge that Lee had not made any additional warranty as to the condition of the motor was a determination of a question of fact by such court.

■ The statement by defendant Sloan that Lee stated, after the combine had stopped on the road, that defendant Sloan would not be required to stand the expense of repair to the combine, was denied by both Blade and Lee, and the trial judge was, therefore, justified in finding that there was no additional or new warranty made at such time. There was also nothing in the conduct of Blade and Lee, in coming over to inspect the combine and in assisting in moving the combine to the implement dealer's and in discussing the repairs with the implement

■

dealer, which should be in any way construed as a warranty or promise by plaintiffs that they would be responsible for repairing the combine. On the record, the trial judge could have concluded that these were actions of reasonable men in attempting to help defendant who might not have known how to start a combine on a cold morning. Plaintiffs had even taken jumper cables along to attempt to start the combine on the road after defendant Sloan had called. At the time of the removal of the machine, neither plaintiffs nor defendant Sloan knew what was wrong with the combine and did not know whether defendant Sloan would be responsible in any manner for the damage. On the basis of the record, there was nothing in such conduct which would subject them to liability for the damage which actually occurred.

■ The only remaining question of significance is whether the awarding of interest at 5% from February 1, 1965, was proper. Such allowance was not made by reason of vexatious delay, on the basis of the trial court's memorandum, but simply because defendant had wrongfully stopped payment on his check. Interest was, therefore, allowable under the statute (1967 Ill Rev Stats, c 74, § 2). For our purposes on this appeal, this judgment was granted as a result of the wrongful stoppage of payment on the check. The trial judge could properly award interest under § 3–122 of chapter 26, 1967 Ill Rev Stats. We find no error in the cause which would justify reversal.

The judgment of the Circuit Court of Warren County will, therefore, be affirmed.

Affirmed.

STOUDER, P. J. and RYAN, J., concur.